Based upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence MODIFIES and AFFIRMS the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner and in the Pretrial Agreement as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Worker's Compensation Act.
2. The primary issue is whether plaintiff sustained a compensable occupational disease due to work with the defendant-employer.
3. All medical records from plaintiff may be admitted into evidence.
4. Plaintiff has not lost any time from work.
**************
The Full Commission modifies and adopts the Findings of Fact of the Deputy Commissioner as follows:
FINDINGS OF FACT
1. Plaintiff is a right-handed female in her early forties. Although she has worked at defendant-employer's diesel engine manufacturing plant since February 15, 1988, plaintiff has never worked on the assembly line which involves the actual assembling of the engines which requires the type of pliers, wrench, mallet and pneumatic tool usage contemplated by Dr. Whitmer in his testimony. Until her transfer to lighter work in the paint area after developing problems with her dominant right upper extremity, she had always been a test technician.
2. As a test technician, plaintiff was responsible for testing various aspects or functions of diesel engines after they had been manufactured or assembled by others. This job required her to work on a rotating basis for differing periods of time at eight separate test stations. Plaintiff had been certified to operate all of the following machines: deharness oil drain, harness fuel fill, harness throttle/oil fill, deharness combustion air, deharness unload to paint, deharness oil pan plug, deharness black light and harness prime stations.
3. The exact particulars of the jobs performed by the test technician at each station are more fully described in the job descriptions and illustrative photographs marked as Defendant's Exhibits 1 through 8 which were received into evidence without objection and are hereby incorporated by reference as if fully set forth herein.
4. Each assembled engine arrived at plaintiff's particular test station by conveyor and depending upon the particular station, she had between 72 to as much as 108 to 119 seconds to test each engine. While inspecting the engines, plaintiff still retained control of the line should she need some additional time to complete her testing.
5. Dr. Whitmer assumed plaintiff was involved in the engine assembly process at the time she developed the right hand problem, which involved strenuous or forceful use of mallets, pliers, screwdrivers, wrenches, pneumatic tools and other tools. Actually, plaintiff simply tested engines that had already been assembled. In the course of testing the engines, she was only required to use torque and regular wrenches as well as pneumatic tools at some, but not all of the work stations. Plaintiff did not use the tools in the forceful manner involved in the initial assembly of the engines.
6. At or near the time of developing the upper extremity complaints, plaintiff was working regularly at the black light station, which was the lightest of all the test stations. She worked the black light station the most during her period of employment of at least two and a half years. At the black light station, plaintiff was merely responsible for checking engines for leaks, which she did with a black fluorescent light held in her left hand. She used several fingers of her dominant right hand to depress and hold down for thirty to forty seconds the buttons that allowed each engine to rotate while being checked for leaks. Depressing and holding the button did not require significant force.
7. Plaintiff's occupational disease claim is for tendonitis that plaintiff initially developed in her dominant right arm and which ultimately evolved into the chronic myofacial pain syndrome from which she now suffers. The myofacial pain syndrome affects her entire right upper extremity and the shoulder area most severely. Plaintiff is alleging that her job duties as a test technician significantly contributed to the development of her right upper extremity problems.
8. Tendonitis is a condition that involves inflammation or swelling of the tendons and is usually localized to a particular part of the body, such as plaintiff's dominant right forearm in this case, as opposed to the more diverse symptoms found in the chronic myofacial pain which affects multiple tendons, ligaments or joints throughout the body such as the entire upper extremity as in plaintiff's case.
9. Tendonitis is usually activity-related, either due to a specific traumatic injury or overuse of the affected tendon. The only specific injury to plaintiff's right arm occurred in June, 1988 when plaintiff suffered a contusion as a result of being struck on the right arm by a gun she was using while attempting to remove an engine plug. The injury resulted in pain and bruising in the area which required medical treatment. Plaintiff subsequently recovered from the same injury and it did not cause her to develop the tendonitis which is the subject of this claim.
10. In December, 1988 without incident or injury, plaintiff developed tendonitis, which initially only affected her forearm. This required her to begin using a wrist brace. Despite her symptoms, plaintiff was able to continue working regularly. By the end of January, 1989, plaintiff developed a gradual onset of pain in her right shoulder, which progressively increased along with the forearm pain she had experienced since December, 1988. The increased pain forced her to seek medical treatment from Dr. Hughes, the "company" physician, on February 2, 1989. Between February, 1989 and October, 1989, Dr. Hughes provided a conservative course of treatment, including physical therapy and placing her on restricted work. During this same period, plaintiff was also seen by a local orthopedic surgeon, Dr. Marsigli. In November, 1990 plaintiff returned to Dr. Hughes because of continued wrist and forearm pain and he referred her to a neurologist, Dr. Deans, for nerve conduction studies to determine whether she was suffering from carpal tunnel syndrome. The tests were negative which indicated that the plaintiff was not suffering from carpal tunnel syndrome. Until her return for the problems giving rise to this action in September, 1993, plaintiff was last seen by Dr. Hughes for problems with tendonitis in December, 1990.
11. In September, 1993 without specific incident or injury, after she had been working on the oil plug station for three and a half hours to relieve an absent worker, plaintiff developed a recurrence of tendonitis in her dominant right upper extremity requiring her to return to Dr. Hughes, who subsequently provided a conservative course of treatment, including restrictions of lighter work. The black light station where plaintiff worked regularly and the light prime station were within the doctor's work restrictions. Subsequently, in January, 1996 plaintiff was restricted to work in the paint area because she was only capable of performing two of the three stations that she was required to perform as a test technician. Due to continuing and progressive physical problems from the chronic myofacial pain syndrome, plaintiff is no longer able to perform all of her usual job duties in the paint areas and as a result, at the time of the hearing before the deputy commissioner she had a masking job in the paint area which was within her physical limitations and had been approved by both Dr. Hughes and Dr. Whitmer, the orthopedic surgeon that treated plaintiff at her request. In the paint area, and in particular, the masking job, plaintiff earns $14.92 an hour, the same as her pre-injury wages.
12. There is no credible medical evidence that the tendonitis that plaintiff initially developed in her dominant right upper extremity in September, 1990 which ultimately evolved into the chronic myofacial pain syndrome from which she now suffers was due in significant part to plaintiff's job as a test technician. There is also no credible medical evidence that the job placed her at an increased risk of developing the same condition. Dr. Whitmer's testimony is based in part on the incorrect premise that plaintiff was involved in the actual engine assembly requiring the type of strenuous and repetitive tool usage Dr. Whitmer contemplated in expressing his opinion. Consequently, Dr. Whitmer's opinion that the job placed plaintiff at an increased risk of developing tendonitis is not accepted as credible.
13. Myofacial pain syndrome is not a very well understood syndrome involving multiple specific muscular groups, ligaments or joints unlike tendonitis that affects specific tendons. The same condition can develop insidiously without specific trauma and affects five percent (5%) of women of childbearing age up to their mid-fifties. It is worse with extremes of temperatures, mental or physical stress, and activity causes more pain. Predisposing factors are age, gender and build. Had plaintiff's job been a contributing factor in the development of her myofacial pain syndrome, her condition should have improved when she was placed on lighter work, but it did not. Her employment did not place her at an increased risk of developing the chronic myofacial pain syndrome from which she now suffers nor is there any evidence that her employment was a significant contributing factor in the development of the same condition. Plaintiff was already predisposed to developing myofacial pain syndrome because of her age, gender and build and would likely have developed it even if she had not worked for defendant-employer as a test technician.
**************
The foregoing stipulations and findings of fact engender the following:
CONCLUSIONS OF LAW
1. Plaintiff's has not proven by the greater weight of the evidence that the condition for which she claims compensation under the Workers' Compensation Act was due to causes and conditions that are characteristic of, or peculiar to her particular trade, occupation or employment for defendant-employer, but excluding all ordinary diseases of life to which the public is equally exposed outside of that employment. Further, plaintiff has not suffered any compensable disability from the same condition because she has been able to continue working regularly for defendant-employer earning a comparable wage even though she is only capable of light duty work.
2. Plaintiff does not require continued medical treatment.
**************
Based on the foregoing stipulations, findings of fact and conclusions of law the Full Commission enters the following:
AWARD
1. Plaintiff's claim must be and is hereby DENIED.
2. Each side shall bear its own cost, and as part of its cost defendant shall pay the expert witness fees previously awarded Doctors Hughes and Whitmer.
 S/ __________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ ________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ ________________ LAURA K. MAVRETIC COMMISSIONER
BSB/jth